Good morning, Your Honors. May it please the Court, my name is David Poore and I represent the appellant in this case, Mrs. Flanagan. May I reserve three minutes of time for rebuttal in this case? And keep your eye on the clock, it counts down. Okay, great, thank you. There are three claims that are at issue in this particular appeal. The first two claims arise under the First Amendment. The first claim is a retaliation claim. The second is a free exercise claim. And the third claim is the Title VII FEHA, or Fair Employment and Housing Act, claim that alleges religious discrimination in the workplace. The first claim, the retaliation claim, Judge Chin, who is a district court judge, decided that the claim should be dismissed as a matter of law because the plaintiff's personal opinions and speech regarding her Christian faith, same-sex marriage, and homosexuality deserve no protection under the First Amendment. It is our position today that that ruling was an error. This is pretty much a Garcetti question, right? That is to say, was her speech a speech addressed to something of public interest in the manner in which public interest is understood under Garcetti, or is this just something that happened in the workplace? So it's basically a Garcetti question? It is a Garcetti question, Your Honor. But it's complicated a little bit because there were two of her coworkers that did say in the workplace that she did express neutral opinions about homosexuality and her Christian faith, but nothing derogatory. She didn't cross the line. So you do have some comments that were made to coworkers in the workplace. Are you saying then, so she's denying it in a way and there's an issue of fact? There is an issue of fact. Okay. So that it shouldn't have been granted as a matter of law? Absolutely. And during this particular time, this was 2013, so there was obviously a lot of commotion about same-sex marriage, whether or not it was protected under our Constitution, and there were a lot of dividing lines that were happening because of that. And so basically in this particular circumstance, Ms. Flanagan and some of her coworkers have said she shared her Christian faith or her beliefs in the workplace and outside of the workplace. In order to sustain the summary judgment, what I think we have to do is to say that even if every factually contested point goes against her, nonetheless, she loses. That is to say, if we believe her, nothing happened. That is correct. If we believe them, something did happen. Well, it could turn out that that's right. And if that turns out to be what the finding is, nonetheless she's not protected, then summary judgment's okay. Absolutely. So for purposes of our summary judgment question, I guess we assume that the allegations that she said are true, and then we go from there. I would agree. Even if the Court finds there may be disputed issues of fact pertaining to whether or not she said it and then did she cross the line in saying some of these things, if the Court determines as a matter of law that this does not implicate a matter of public concern, then obviously the plaintiff loses that first claim. I mean, it seems to me that if we give her the benefit of the doubt that she holds these views sincerely and so on, the city has a countervailing interest in essentially prohibiting discrimination in the workplace. And if she was doing anything that may have given act to her beliefs, and I'm referring specifically to refusing to let the lesbian volunteer in on 20 or more occasions, and we decide it's not a matter of public concern, then the city would be justified in terminating her, would they not? They would. I think if you had a Pickering analysis here and factually it was determined that she did commit the misconduct, that her comments did cross the line, so to speak, then I think they would. It was more than comments. I guess that's what I was getting at. It was actually active discrimination in the sense that she wouldn't open the door to the secured area of the police station in order to permit a lesbian volunteer to enter that area. That's correct. I think that their argument was not only did she make the comments, but there was a course of conduct that occurred over a period of approximately 12 months where she would not allow access to the volunteer to come in. I guess my point is that's not speech. That's conduct. The city has a policy that says we don't tolerate discrimination on the basis of sexual orientation. If she's treating a lesbian volunteer differently because she's a lesbian, then the city has a legitimate interest in disciplining a police department employee who does that. There's no question about that. That's why I say that these are disputed matters. My client denies refusing the access to Ms. Taylor on these occasions. I thought your client admitted that something to the effect of had I known it was you when she was permitted to enter on at least, what was it, April the 13th? It was April 18th of 2013. 2013. So your client doesn't deny that she didn't let, I guess it's an admission. That's what I read it to be. No, there are varying accounts of what occurred. Had I known it was you, I wouldn't have let you in is basically what she said. There are varying accounts of what occurred on April 18th. The victim. But I thought she admitted at least that. What she admitted is that she didn't see her ID, and so she said, if I would have known it was just you, I wouldn't have let you in. She came in with the other volunteer who did show her ID, so that's the only reason why she let her into the building. So in other words, she's disputing the very material issue of fact. She is. And she's saying that she had a legitimate reason for actually questioning her ID at that point, because it is undisputed that Ms. Taylor did not show her ID on that particular day, April 18th. That's not disputed in this case. And really what happened on April 18th, there's a very serious question because not even Ms. Taylor supports what the city claimed my client did to her. Ms. Taylor herself did not say that she was rude. She simply said, oh, I thought it was an officer when my client, you know, saw her come in that day. So despite what the city is trying to claim, I don't think that even Ms. Taylor supports the allegation that somehow my client was nasty or rude to her on that particular day. Can I come back to the sort of the statements of public interest or public concern? I mean, it's a tricky question sort of analytically. If your client said only what she says she said, basically there's no public concern stuff because she says I really didn't say any of it. No, what my client says that she did say and then what two of the witnesses say that she did say in the workplace was that her Christian faith did not believe in homosexuality or same-sex marriage, but nothing more. So, for example, Chandra. But if that's all she said, that doesn't even come close to statements of public concern. The statements of public concern are when somebody says something to somebody outside of the workplace so that something can be done about it or object to it so the public understands that something's going on. If this is purely internal and all she says is this is my faith or this is what my faith says, I don't think we get into statements of public concern for free speech protection. I don't know if that's the correct analysis because, at least under the city of San Bernardino case, I think that would be correct if this was in connection with some type of grievance or personal dispute. But if an employer finds out that an employee holds a sincerely held religious belief through whatever source, it could be the personal opinion of the employee, a comment made in the break room, whatever it may be, and the employer then fires the employee because of those, that personally held sincere belief. I believe the employee still deserves protections because, again, it's not part of some internal dispute. Kennedy. But that may then be a free exercise or establishment protection, not a free speech protection. I know that there are no cases that cover this particular dispute except for the Cochran case, which is a lower court opinion out of Atlanta, in which the Court did find that an employee's statements concerning same-sex marriage and homosexuality in the Christian faith did deserve protection in the workplace. That's why I asked you the question about the difference between her beliefs and speech about her beliefs and action because it seems to me that the city's theory here is that it was her sincerely held beliefs and disapproval of homosexual lifestyle that led her to take certain actions in the workplace against those individuals that she perceived to be homosexual. And the city has a policy that prohibits that. And that, to me, that doesn't sound like a First Amendment-protected activity. Well, I think it would only implicate the First Amendment if you had the Pickering balancing test for some action that she did, if she posted a flyer. It establishes the motive for the action, the action being refusing to allow entry on 20 occasions. And I agree. I think if the jury, if a reasonable jury determined that she denied access to Ms. Taylor on those occasions and it was based upon her sexual orientation, I think that the jury should find in favor of the city in the case. What evidence do we have with respect to denying entrance and on how many occasions? The evidence we have is contained in the investigative report, which is at 389 through 411 in the record. And it talks about how Ms. Taylor was denied access by Mrs. Flanagan and several other police records specialists or records clerks in the department and how she complained about it over a period of approximately a year. And so in the report itself, it details approximately 20 to 30 circumstances or it lists 20 or 30 circumstances in which she was denied access by various records specialists over a period of time. And your client, as I understand it, says and refutes the charge that she, in fact, refused her entry because of her, she was a homosexual. Is that right? Absolutely. And she has done that under oath? She has. Okay. And that's where your big problem is here. Part of the problem here is that summary judgment should not have been granted. Correct. That is our argument before this Court today, is that there were disputed issues of fact and that the Court, Judge Chinn, did weigh the evidence and determined that the four people that allegedly came forward to identify what he characterized as homophobic statements that my client had made, that indeed those statements were true when my client denied making the statements. And actually, if you look carefully at the report, he identifies four individuals. Two of those individuals say that she made neutral statements about her faith in homosexuality, but nothing disparaging. So you actually have a conflict in the report itself about what was said. And what are the specific charges on which she was dismissed? They're actually very narrow. I mean, she's got a history of some difficulty, but then the specific charges on which she's dismissed are actually very precise. Can you review those for me? Absolutely. They are contained at 389 of the investigative report. Yeah, yeah. It is that, and I'll insert plaintiff for the name. Plaintiff was discourteous and disrespectful towards Sequoyah Taylor, which was the volunteer, on April 18, 2013, when Taylor arrived at the police department to attend a meeting. And apparently that allegation was sustained. The second allegation was she created a hostile work environment by speaking openly to her coworkers about her dislike and bias towards homosexuals and denying Taylor access into the police department because of her sexual orientation. And the third allegation is that plaintiff provided false and or misleading statements to her supervisor during the administrative interview. And when asked about that third one, they simply only identified the fact that she denied the charges as being a quote-unquote lie, and that was contained in Lieutenant Cran's deposition. If each of those is properly sustained, was she permissibly discharged? She was. And she admitted that in her deposition, that if these things were true, then she herself, she'd been with the RPD for almost 25 years. A long time. So she herself knew that if these were things that were said in the workplace, then termination was more than appropriate. And she admitted that in deposition. So this is a tricky question. And I realize we're taking your time, but don't worry. Okay. But this is a tricky question, then. If we've got an administrative hearing and we've got a finding after the administrative hearing that is supported by some evidence, maybe disputed evidence, but the conclusion at the end of the hearing by the hearing officer says that's what it is, does she get a de novo trial on what happened in the district court? She does. A scaly hearing is something that the department is obligated to do as a pre-deprivation of her procedure or, excuse me, her property interest. So it's a procedural due process question. We did allege that initially in the complaint. In this case, this is not subject to the appeal here today. But that the pre- or the scaly hearing is a requirement for all public employees in California. What is her? But I'm not going to pursue this because I'm not sure. That doesn't quite fit with me. That she just gets to try it all over again, whether or not she was, in fact, discourteous, whether, in fact, she did refuse to admit Ms. Taylor and so on. You're saying that this really is nothing here. She gets a de novo trial on all of the factual support for these findings. I don't know if I would call it a de novo trial. A scaly hearing is meant to be an informal meeting between a supervisor and the employee about whether or not the misconduct was submitted. Typically, witnesses are not called. There's no cross-examination. It's simply a process to give the employee some due process so they're not deprived of property interest prior to being terminated. Essentially, it gives the employee an opportunity to comment to, in this case, the chief. That's right. Who has been provided with the internal report, and then he asks the employee, what do you have to say in regard to these allegations? And she did deny it at the scaly hearing, and that was part of the reason for the termination is that he felt as though she should admit these things instead of denying them. Why? And, you know, Mrs. Flanagan, she's not going to just submit something to and just to save her job, I suppose. She did deny the allegations, and she continues to deny them today. Okay. And I see my time is almost up. We'll give you a chance, Chris. Thank you. Good morning, Your Honors. May it please the Court. My name is Christine Maloney. I represent the City of Richmond and former police chief, Chris Magnus, now chief of Tucson, Arizona. I would like to address this issue of the free speech claim. Nowhere in the complaint is the free speech claim alleged. The first cause of action is a cause of action under Section 1983. It identifies a number of constitutional violations. Nowhere does the word speech or the term free speech appear. Plaintiff fashioned the complaint as a petition claim and describes that her First Amendment activity under the petition clause were her complaints on matters of public concern, which in deposition she explained to me were the two e-mails she sent to supervisors complaining about Chief Magnus, allegedly running a, quote, corrupt department, and in a different e-mail allegedly being not fair and impartial. Those were the petitions that she made through her e-mails that she claimed supported her First Amendment claim, not religious speech, not allegedly telling anybody, whether on or off duty, that she is a Christian who has firm views on homosexuality and same-sex marriage. That's not anywhere in the complaint. It wasn't in my motion for summary judgment because I'm not clairvoyant. That came up only in opposition to summary judgment. And the Court dealt with all the various bases of her First and Fourteenth Amendment claims, including this last one that was tacked on at the end. But we opposed that claim on the ground that when bringing a motion for summary judgment ---- What you're saying is that she raised that for the first time in the response to the motion for summary judgment. That's correct. And exactly what did she say? In the opposition to the motion for summary judgment? Yes, in the opposition. She addressed what was in the complaint, which were the petition claim for her complaints on the matter of public concern. And then she added that, you know, besides that point, she's also engaged in protected speech based on her religion. And it was not that she had made the very homophobic and offensive and discriminatory comments that she was terminated for. She now claims, without any evidence in the record, that she in her off-duty hours told some identified coworkers about her firmly held religious beliefs that include views on same-sex marriage. That doesn't appear anywhere in the record. That is a newly minted claim by plaintiff's counsel to try to make this a public concern case, which wasn't pled as a religious speech case. You know, given the fact of the current legal landscape and the same-sex marriage cases. But that was never anything in the record that she complained about. How did you reply to it? We replied to it just in the way I did here, that Ninth Circuit case law says that the framework for a summary judgment motion is by the theories pled in the complaint. You cannot, for the first time, in opposition to summary judgment, raise a new legal theory without going through the process of seeking amendment, which was never done in this case. That was our primary argument. Our secondary argument, which was brief, was that even if you considered this, it would still fall under the Garcetti or Pickering analysis for the same reasons that we went through with the petition claims on the complaints of matters of public concern. So I do not believe this issue is even properly before the court for decision because it was not properly raised in the complaint in the proceedings below. I'd like to also address, though, on that speech claim, I think, Judge Silver, you said, if she disputes that she made these homophobic remarks, isn't that enough to create an issue of fact whether we're talking the speech claim or the discrimination claim? And the answer to that is unqualifiedly no. And I would refer you to the Ninth Circuit decision in VREMO v. Aloha Airlines. In that case, the Ninth Circuit said that you do not create a genuine issue of fact as to pretext by merely disputing the employer's legitimate business reason. You must show by specific and substantial evidence of pretext that the defendant did not reasonably believe the reason to be true, did not hold a good faith reasonable belief that the stated reasons were true. And there is no evidence in this record that the city and Chief Magnus and the ultimate decision maker, the city manager, did not believe these reasons to be true. Well, if she had denied it, however, then they made a decision basically that she wasn't telling the truth. Is that right? Is that your position in terms of whether or not they've established it wasn't pretext? I mean, they had to consider they have to consider that, that she denied it. Or did they not? They considered that when they were doing the investigation. She was in her interview with Lieutenant Curran, who was the investigator on the matter.  Whether she made these statements that two or three of her coworkers had heard her say at work. And her answers were invariably, no, I did not or I do not recall. So she denied it in the investigation. Lieutenant Curran determined that her answers were such that they actually indicated she was not telling the truth because they were consistent denials. I would also add that in the investigation. And Judge Chin could make that decision on that record as a matter of law. It's not a credibility issue. Judge Chin didn't have to make that decision because the city made that decision. The city was entitled to make its legitimate nondiscriminatory business reason. Right. But what I'm saying is that it established that there was no pretext. You're saying it was established there was no pretext. It established the legitimate business reason. To disprove that and show pretext, the plaintiff can't merely dispute the reason and say, no, you know, I never said those things. She actually has to show that the city didn't believe those things they were saying were true were true. That the city didn't believe she had made these homophobic, offensive comments in the workplace. That's what she has to show. In her deposition, she testified that she doesn't believe Chief Magnus made any of these statements up. She doesn't believe Lori Curran made any of these statements up. She believes her coworkers lied. That's her theory. To show pretext, she has to show that the employer didn't believe it was true. But you essentially, it's on your summary judgment, you're establishing that she could not show pretext. So, essentially, there is no pretext. Right? Yes. On that record. Yes. There's no issue of fact on whether or not she could have shown pretext to a jury. Yes. And there's a number of ways to show pretext, and we showed that she could not prove pretext in those ways. Even though she denied it. Even though she denied the underlying conduct. Because her denial alone doesn't create pretext. That's via remo. She has to show that the employer did not in good faith reasonably believe its own legitimate business reason. In other words, it was a fabrication. Or that a jury would find that it was, that they, in fact, that was the, they would find that as a matter of law. Or that a jury would find the employer did not reasonably believe. And your argument is, well, if her defense or her side of the case is, well, my fellow employees were lying, you're saying, well, that can't possibly then be pretext because it's not pretext by the employees. It's rather pretext by the person who does the firing. And the person who does the firing is hearing what the employees are saying. Yes. That's your argument. They're relying upon an investigation where all these people were interviewed. The investigator is evaluating their relative statements, making credibility determinations. And the employer is entitled to make those. And it was reasonable. You have to come up with it. Make those determinations, meaning the employer, despite the fact the employer is biased, right, in determining whether or not who is telling the truth and who's not. I don't know how you could say the employer is biased. There's no evidence of bias. Well, I mean, just naturally, the employer is going to be happy to be able to justify that she was let go. So there's, you know, institutional bias. But I'm not – I'm just suggesting that not – because the employer is the one that made the credibility determination. Yes. Okay. Which they're entitled to do to come to a business reason. And then to show that that's wrong for purposes of a discrimination or speech analysis, it's the plaintiff's burden to show by specific and substantial evidence that they didn't reasonably believe those reasons to be true. So is this akin to the McDonnell-Douglas burden shifting the three-step analysis? She claims she was discriminated against because of her religious beliefs. The employer offers a legitimate reason for terminating her based on the internal investigation report. And then at step three, she has to come forward with evidence of pretext to show that the employer's reliance on that internal investigation report really wasn't in good faith, that they actually fired her because of her religious beliefs. And you're saying simply denying the investigation report and the statements by all the other witnesses against her is not enough at step three to meet her burden. That's why it doesn't need to go to trial. It is not enough at step three on the discrimination claim for certain. Yes. Okay. It seems to me you accept the view that she had a sincerely held religious belief that homosexuality was not. I'll quote her from her deposition. Homosexuality is a sin just like murder, adultery, and theft. And that is a religious belief? She ever explained? That's the way she articulated it. Okay. As a firmly held religious belief. And that, you basically accepted that as true? Yes. Yes. But the problem is, from the standpoint of her employer, she can hold those beliefs, but she can't do things in the workplace that interfere with the orderly operation of the workplace. That's correct. She cannot make statements in the workplace in front of coworkers that she believes homosexuality is a sin, that anybody who is a homosexuality is going to go to hell, that the chief, who is an openly gay man, was creating a gay environment, that God created Adam and Eve, not Adam and Steve, and the litany of other offensive homophobic claims that she made. Including that she wondered, with respect to Sequoia Taylor, the volunteer, what bathroom she might use, the men's or the women's. That she wondered with Sequoia Taylor, or she stated that she wouldn't want to go to the gym with Ms. Taylor for fear that Ms. Taylor would stare at her. Blatantly homophobic comments that when said in the workplace can create a hostile environment not just for Ms. Taylor, a volunteer, but for any other employee who is a sexual minority in the workplace. That's the conduct that she was terminated for, not for her beliefs. Okay, so we've talked about the first cause of action, which I fashion as a petition cause of action. I'd like to address what is not presented by this appeal. The district court's dismissal of the Section 1983 claims as to due process, as to the establishment clause, and as to the petition rights must be affirmed, the dismissal of those. They are not raised on appeal. I would also like to point out that the municipal liability under Section 1983 was dismissed by Judge Chen in the district court on summary judgment. That has not been appealed. So we're only looking on the first cause of action at whether a claim for free speech was pled and exists against Chief Magnus. Keep in mind that Chief Magnus was not the ultimate decision maker in this case. He was the skelly officer. And so what the process was is a complaint came forward from Ms. Taylor to Vicki Riggins, an administrative secretary, who informed Deputy Chief Medina, this is in his declaration, that a complaint had been made and Ms. Taylor was uncertain whether or not her friction and inability to access the department was due to her sexual orientation. So Deputy Chief Medina instructed Ms. Flanagan's, the plaintiff's, supervisor, Lieutenant Curran, to conduct an investigation, who did it along with the immediate supervisor. That investigation is then reviewed through the chain of command. It went to Captain Anthony Williams. There's the person, whose name we haven't heard, who actually recommended termination. He was the one who looks at the investigation, formulates his recommendation. That goes to the deputy chief to agree or disagree. And then it goes to the human resources director for the city, Lisa Stevenson, another name we haven't even heard, who actually writes the recommendation for termination. And in her deposition or declaration, excuse me, she testifies that she makes recommendations for discipline by comparing the conducted issue to other cases in the city to ensure there's consistent treatment, that the penalties are consistent across the city, that due process is followed. And she is the one that authored what we call the Skelly Notice, the recommendation for termination. Then there is this pre-termination informal meeting with a Skelly officer, who is the chief, who hears whether the employee has any evidence that should be considered or is allowed to give reasons why they shouldn't be terminated before the decision is made. The Skelly officer hears that, writes up a report, makes a recommendation, gives it to the city manager, who is the ultimate decision maker, and that was Bill Lindsey. In this case, Chief Magnus was merely one step in this whole process, and yet he is the one accused of discrimination. And if you look at the record closely, you'll realize the reason is because he's a gay man. She, the plaintiff stated in her deposition to me, and she stated in her EEOC and DFPH paperwork, that she did not believe he could fairly pass on her guilt because of his own personal biases as a gay man, not because he ever articulated any bias to her. That was her judgment, her bias, that led her to conclude he could not be fair. Okay, now you're a minute over. Do you want to sum up? I will sum up. We respectfully request that the Court affirm the district court on all causes of action and specifically the ones that are not appealed here, and then with respect to the speech claim, we believe it's nonexistent. For the same reasons in our brief, we think the exercise claim is nonexistent. It was fled as an establishment cause claim. And that with respect to discrimination, I would actually refer the Court to at least one or two Ninth Circuit decisions that are incredibly close. Patterson-Peterson v. Hewlett-Packard, the Ninth Circuit 2004 decision, where an employee posted a note. You've cited us the case, and you've got one more. Okay. And Bodette v. Coxcom, also a 2004 case. Okay. And I thank you. Thank you. Thank you very much. Thank you, Your Honor. I'll be as brief as possible. With respect to whether or not this is adequately alleged in the complaint, I would point the Court to paragraphs 13, 26, 34, 36, and 43, which go into detail about plaintiffs' religious beliefs and eventually conclude with the plaintiff's defendants violated plaintiff's First Amendment rights, and that defendants retaliated against plaintiff for making complaints of public concern to defendants and terminated plaintiff as a result of her religious beliefs. And you've cited those in your reply brief. And that is contained at SCR 27-28. With respect to pretext, I do think it needs to be addressed because I don't think I covered some of that in my initial argument. There is evidence in the record that others similarly situated employees were treated differently than the plaintiff. In the investigation report itself, it identifies many circumstances of other record specialists denying access to volunteer tailor and potentially being rude in that respect. Were all presented to the district court judge as admissible evidence? Yes, Your Honor. Okay. It wasn't just alleged in the complaint? Correct. And the other one was we had a declaration from an officer, Riley, with RPD, who claims that one of the record's clerk made a homophobic remark to him and nothing was done about it. So we do have evidence in the record that can establish pretext in addition to the fact that Chief Magnus and Lieutenant Coran had conflicts of interest when they conducted their proceedings. Irregularity in proceedings can be a factor for pretext. And most importantly, the six-month limitation in the collective bargaining agreement, we'd ask the court to take a look at that particular irregularity. They can only go back six months to discipline somebody. They're aware, apparently, the plaintiff was denying access for 12, 18 months, and they did nothing until April 18th of 2013. But if the investigation was triggered by Taylor's complaint in April of 2013 about being denied access, why is it improper for the employer to determine that there may have been a pattern of access denials that went back for some period of time? How does that violate the collective bargaining agreement? Well, because the collective bargaining agreement does allow for related conduct if the employee was previously disciplined. That's what the defendant argued in this case. The problem is there's no evidence in the record the plaintiff was ever previously disciplined for this and she denied it. But they didn't receive any complaints about that until April of 2013. I mean, to me, it's just a matter of evidence to show a continuing pattern. She was disciplined for what she did on April whatever the date was in 2013, right? That's what triggered the investigation. That is what triggered the investigation. But if the city was aware of similar conduct and it occurred 12 or 18 months beforehand and nothing was done.  No, that's incorrect. In the investigative report itself, it says that Ms. Taylor complained in March of 2012. And then again, and I would refer the court to 399 and 400, which is Lisa Everett's statement, she was my client's supervisor. And she specifically says here that she witnessed numerous incidents when Flanagan ignored Taylor while she stood in front of the counter to get into the building. Everett did not counsel or discipline Flanagan for this, nor did she ever explore the reasoning behind Flanagan's behavior. So my client's own supervisor was aware of this in 2012 and nothing was done about it. Thank you. Thank you very much. The case of Flanagan v. City of Richmond and Christopher Magnus submitted for decision. At this point, we will take a ten-minute break and we'll be back in ten minutes. Thank you very much. All rise. This court stands resettled in ten minutes.
judges: W. Fletcher, Tallman, Silver